

### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT MURFREESBORO

| | | |
|---|---|---|
| **Anthony Reed,** | ) | **Docket No. 2017-05-0061** |
| **Employee,** | ) | |
| **v.** | ) | **State File No. 38456-2017** |
| **Nissan N.A., Inc.** | ) | |
| **Employer,** | ) | **Judge Robert Durham** |
| **v.** | ) | |
| **Safety Nat'l Cas. Corp.,** | ) | |
| **Carrier.** | ) | |

---

## COMPENSATION HEARING ORDER

---

This Court conducted a compensation hearing on January 11, 2019. At issue are the impairment rating for Mr. Reed's compensable bilateral carpal tunnel syndrome and whether he suffered a work-related injury to his right cubital tunnel.[1] The Court holds that Dr. Jeffrey Hazlewood's impairment rating is entitled to more weight than that given by Dr. S. R. Brown. The Court further holds Mr. Reed proved that he is entitled to treatment for his right cubital tunnel.

### History of Claim

Mr. Reed has worked for Nissan for over thirty-four years. Over the decades, he performed a variety of jobs that required him to lift and maneuver heavy car parts hundreds of times each day as well as use air drills and other vibratory tools. For the last several years, he has worked as lead technician responsible for correcting defects on newly-manufactured vehicles. Mr. Reed estimated that during his tenure with Nissan, he worked six full days per week eighty percent of the time, and there were several instances where he worked twelve-hour shifts, seven days per week, for months at a time.

Mr. Reed first experienced pain and numbness in his hands in 2000. He received

---

[1] The parties stipulated that: Mr. Reed's bilateral carpal tunnel syndrome is compensable; he is only seeking medical benefits for his asserted right cubital tunnel injury; his compensation rate is $888.60; and he is not owed any medical expenses or temporary disability benefits.

treatment with the physician at Nissan's in-house clinic and began wearing braces on both arms. However, he did not receive additional treatment or miss work from this condition until 2015, when he complained of a work injury to his chest and left shoulder. While treating for this injury, his left upper extremity complaints led to an EMG/NCS with physiatrist Jeffrey Hazlewood, who diagnosed him with moderately severe left carpal tunnel syndrome (CTS).

The Nissan physician told Mr. Reed that the CTS was not work-related, so he sought treatment through his health insurance with orthopedist S. R. Brown. Dr. Brown performed a left carpal tunnel release, which alleviated Mr. Reed's symptoms. However, he continued to complain of right-arm problems. Dr. Brown ordered an EMG/NCS with neurologist Robert Clendenin, which revealed moderately severe CTS in Mr. Reed's right arm. Dr. Brown then performed a right carpal tunnel release in April 2015.

Approximately one year later, Mr. Reed's upper extremity symptoms resurfaced. He returned to Dr. Brown, again under his health insurance, complaining of stiffness with numbness and tingling in both hands. Dr. Brown recommended repeat EMG/NCS studies with Dr. Clendenin performing the test on the right and Dr. Hazlewood doing so for the left. Dr. Clendenin noted only mild post-surgical improvement in the right carpal tunnel, and he also diagnosed Mr. Reed with mild right cubital tunnel syndrome. Dr. Hazlewood's testing revealed no post-surgical improvement in the left arm. Based on these tests, Dr. Brown diagnosed Mr. Reed with recurrent bilateral CTS and cubital tunnel syndrome. She recommended Mr. Reed undergo bilateral revision open carpal tunnel releases. She also felt the CTS and cubital tunnel syndrome were primarily caused by Mr. Reed's employment with Nissan.

Nissan agreed to provide Mr. Reed with a panel. He chose Dr. Hazlewood, who saw him on July 17, 2017. Dr. Hazlewood's report was inexplicably titled "Independent Medical Evaluation with Option to Treat." After explaining the independent medical evaluation (IME) process to Mr. Reed, Dr. Hazlewood conducted an examination and reviewed his history. He found Mr. Reed credible with no evidence of symptom magnification. He concluded that Mr. Reed suffered from bilateral carpal tunnel syndrome that had not improved with surgery. However, he disagreed with Dr. Brown's diagnosis of cubital tunnel syndrome. .

Nissan then authorized Dr. Brown to perform bilateral open revision carpal tunnel releases, but it denied treatment for cubital tunnel syndrome.[2] Following recovery, Dr. Brown gave an impairment of six percent to each upper extremity, which she converted to seven percent to the whole body. Nissan sent Mr. Reed back to Dr. Hazlewood for his impairment rating, and he assessed two percent to the right arm and four percent to the

---

[2]The agreement was memorialized in a Notice of Mediated Agreement filed with the Bureau on August 16, 2017.

2

left, which converted to three-percent whole body.

Dr. Brown testified by deposition. She stated that Mr. Reed reported substantial improvement after surgery. She said she based her impairment on her physical examination as well as EMG/NCSs that showed "conduction blocks for motor and sensory components of the nerve." She assigned six-percent impairment to each extremity using Table 15-23 of the AMA Guides to the Evaluation of Permanent Impairment, 6th ed. ("Guides"). She believed this section gave her the discretion to assign four, five or six percent, so she chose six percent given the severity of Mr. Reed's symptoms and the EMG findings. When she converted and combined those impairments, it resulted in eight-percent impairment to the body, as opposed to the seven percent she gave in her report.

Dr. Brown also testified that Table 15-21 of the Guides gave an impairment of six percent to each extremity. She said that she did not use a "QuickDash" functional assessment to determine impairment modifiers within the grade used because Table 15-23 did not require it.[3] On cross-examination, she admitted she did not use a two-point discrimination test to assess sensory loss. Finally, she conceded that she never received any formal training in assessing impairment.

As to causation, Dr. Brown gave her opinion that Mr. Reed suffers from bilateral carpal tunnel syndrome and right cubital tunnel syndrome that primarily arose out of and in the course and scope of his employment. She acknowledged that she could not recall Mr. Reed's actual job duties, although the case manager provided her with a written description at some point. She also agreed that she saw Mr. Reed on several occasions without noting elbow complaints.

Dr. Hazlewood also gave deposition testimony. Regarding impairment, he stated he received extensive training in using the Guides and also taught other physicians how to use them on several occasions. After Mr. Reed selected him from a panel, Dr. Hazlewood characterized his status as Mr. Reed's authorized treating physician because he rendered a diagnosis and causation opinion. However, he admitted he did not provide any actual treatment.

At his impairment assessment, Mr. Reed exhibited positive Tinel's sign bilaterally, and his motor exam was "completely normal" with no motor weakness or atrophy. Mr. Reed had normal pinprick and two-point discrimination testing in all five fingers of both hands.

_____

[3] Table 15-21 states that Table 15-23 should be used for carpal tunnel syndrome. Pages 448-449 of the Guides, under the section titled "Rating Process," state that the QuickDash assessment should be used to "further modify the grade and to choose the appropriate numerical impairment rating."

3

In evaluating the right arm, Dr. Hazlewood had to use Dr. Clendenin's pre-surgery EMG/NCS because that was the only one available. He noted that Dr. Clendenin did not document the arm temperature at the time of testing, which is required by the Guides to ensure accuracy. He also felt that Dr. Clendenin did not perform a "very specific technique" necessary to determine if there was axon loss or motor/sensory blocks, which the Guides states is necessary if using Table 15-23 for impairment.

Nevertheless, Dr. Hazlewood believed that Mr. Reed was a "straight-up guy [who] had a valid problem," so he decided to use Table 15-23 to calculate right-arm impairment. The table uses diagnostic tests, history, and physical findings to determine certain grades of impairment. First, he found that Mr. Reed should be in Grade 1 for diagnostic tests, since Dr. Clendenin's test did not record a nerve block or axon loss. Second, since Mr. Reed's constant pain and numbness were not corroborated by documented axon loss, he placed him in Grade 2 for history. As for physical findings, he placed Mr. Reed in Grade 1, since his exam did not reveal evidence of sensory loss or muscle atrophy. When averaged, the total grade modifier placed him in Grade 1, or an impairment of one, two, or three percent to the right arm.

To determine the exact impairment, Dr. Hazlewood had Mr. Reed complete a *Quick*Dash questionnaire, which asks about the difficulty the patient has in performing certain activities. He testified that, under Tennessee law, he should not consider pain as a factor in determining impairment. This, he believed, "discredited" the *Quick*Dash test from consideration. Regardless, he asked Mr. Reed to take the survey using only numbness and weakness as factors. He scored 25, which placed Mr. Reed in the middle category. Thus, Dr. Hazlewood concluded that his right carpal tunnel syndrome "deserves a two percent upper extremity rating, not anything more, not anything less."

As for the left arm, Dr. Hazlewood testified that his diagnostic tests, done in accordance with the Guides, revealed a sensory block. This placed Mr. Reed in Grade 2 for diagnostic tests. Given the block and Mr. Reed's complaints, Dr. Hazlewood put him in Grade 3 for history. However, he did not find any sensory loss or muscle atrophy; therefore, he assessed him at Grade 1 for physical findings. When averaged, these results placed Mr. Reed in Grade Modifier 2, which gives an impairment of four, five, or six percent to the upper extremity. Mr. Reed's *Quick*Dash score of 25 required the impairment to be adjusted down by one percent, giving him an impairment of four percent.[4] Dr. Hazlewood converted and combined the impairments for a three-percent whole body impairment.

Regarding causation, Dr. Hazlewood reviewed Mr. Reed's job description. He noted the job duties did not appear to require prolonged bent-elbow positioning. He

---

[4] Dr. Hazlewood gave him the test again but asked him to use pain as a factor. Mr. Reed's score on this test would have increased his impairment for each extremity by a percentage point.

testified he did not feel Mr. Reed had true ulnar neuropathy given the minimal findings on Dr. Clendenin's EMG study, and even if he did, it was not work-related. However, he agreed with Dr. Brown that Mr. Reed's bilateral carpal tunnel syndrome met the causation standard for compensability.

Mr. Reed testified that, although the symptoms have improved since his surgeries, he still experiences constant pain and tingling in both hands. He has decreased his work hours from an average of sixty to seventy hours per week to forty-five. He also stated that he often has help from his co-workers when a job requires forceful grasping. Daily tasks involving grasping, pulling, or carrying cause significant problems. He has to shift hands frequently when driving because they go numb from holding the steering wheel. Turning a doorknob causes severe pain in either hand. To sleep, he still has to wear braces on both hands.

### Findings of Fact and Conclusions of Law

Mr. Reed has the burden of proving by a preponderance of the evidence all essential elements of his workers' compensation claim. *Scott v. Integrity Staffing Solutions,* 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). Here, the only issues are the extent of Mr. Reed's vocational disability for his work-related bilateral carpal tunnel syndrome and whether Nissan is required to pay for treatment of Mr. Reed's asserted right cubital tunnel syndrome.

The Court must first address which doctor is authorized to treat Mr. Reed. The question is important, since the authorized doctor's opinions on causation and impairment are presumed correct unless rebutted by a preponderance of the evidence. Tenn. Code Ann. § 50-6-102(12)(A)(ii) (causation); 50-6-207(k)(7) (impairment).

Nissan rejected Mr. Reed's claim until Dr. Brown, who had already performed carpal tunnel releases on both wrists, gave a positive causation opinion. Nissan then provided Mr. Reed with a panel from which he chose Dr. Hazlewood, who performed an "independent medical evaluation with option to treat." Although Dr. Hazlewood insisted that he was acting as a treating physician, he did not provide any actual treatment or recommend a treatment plan.

Nissan then authorized Dr. Brown to perform surgery. No evidence suggested that Dr. Brown ever referred Mr. Reed back to Dr. Hazlewood. Tennessee Code Annotated section 50-6-204(a)(2)(E) provides that when the treating physician chosen from the initial panel refers an employee to a surgeon who subsequently provides treatment, that surgeon becomes the "treating physician" until treatment concludes *and* the surgeon refers the employee back to the initial panel physician.

Here, Nissan argued that Dr. Brown is not the "treating physician" because she

5

was never chosen from a panel and Dr. Hazlewood never expressly referred Mr. Reed to her. This argument is without merit. Nissan clearly authorized Dr. Brown to perform the carpal tunnel revision surgeries. It cannot now claim that she was not the treating physician simply because it agreed to bypass the statutory steps. In addition, the Court is unconvinced that Dr. Hazlewood qualified as an initial treating physician, given the title of his report and the fact that he did not provide or even recommend treatment. Thus, the Court holds that Dr. Brown was the treating physician for Mr. Reed's bilateral carpal tunnel syndrome and her opinion as to impairment is entitled to a presumption of correctness.

However, that does not end the analysis. Nissan can still prevail if the evidence rebuts Dr. Brown's opinion by a preponderance of the evidence. The Court holds the evidence does just that.

Dr. Brown's opinion as to impairment is lacking in several respects. She admitted she has no training in providing impairments under the Guides. Her inaccuracy in combining impairments and her statement that Table 15-21 also gave a six-percent impairment, when the table clearly states it is not to be used in assessing carpal tunnel syndrome, illustrate this point. She also incorrectly stated that the electrodiagnostic summaries indicated Mr. Reed suffered from both motor and sensory blocks. Dr. Hazlewood specifically stated that his EMG/NCS did not show a motor block and that Dr. Clendenin's report did not record "specific testing" needed to show conduction blocks or axon loss. Dr. Brown admitted that she did not perform two-point discrimination testing. She also did not make any attempt to determine functional disability, because in her words, Table 15-23 did not require it. She also mistakenly stated the table gave her discretion to award four, five or six percent. Given these factors, the Court cannot give weight to Dr. Brown's impairment ratings.

On the other hand, Dr. Hazlewood has extensive training in the Guides and has even taught its application to other physicians. He is also an expert in electrodiagnostic testing, which must be used to rate impairment for CTS under the Guides. He gave a detailed account of his assessment for both hands and provided his rationale for each step. The Court holds that Dr. Hazlewood's procedure and testimony justify giving his impairment more weight in this case.[5]

Therefore, the Court holds that Mr. Reed's impairment is two percent for the right arm and four percent for the left. When converted and combined, his overall impairment

---

[5] The Court recognizes that the impairment might have been different if Dr. Clendenin's pre-surgery EMG/NCS had been more detailed. Further, this holding should not be considered a complete endorsement of Dr. Hazlewood's method, particularly his decision to use his own modified *Quick*Dash evaluation to downgrade Mr. Reed's left arm impairment. While the Court has reservations as to this modification, the lack of credible medical evidence to the contrary compels the Court to accept Dr. Hazlewood's impairment as is.

is three percent to the body as a whole.

As for the cubital tunnel syndrome, Dr. Brown, who has treated Mr. Reed for several years, unequivocally gave her opinion that he suffers from cubital tunnel syndrome in his right arm and that it arose primarily out of and in the course and scope of his employment with Nissan. Her opinion was corroborated by Dr. Clendenin, a respected neurologist. So, even if Dr. Hazlewood is considered the treating physician for this condition, the Court holds that the evidence preponderates against his opinion that Mr. Reed does not suffer from work-related right cubital tunnel syndrome. Dr. Brown, who has already provided treatment and recommended a course of action, shall be the treating physician for this condition.

**IT IS, THEREFORE, ORDERED** as follows:

1. Mr. Reed's vocational disability is three percent to the body as a whole, which equates to $11,998 at his compensation rate of $888. Nissan shall pay $11,998 in a lump sum from which his counsel is awarded twenty percent, or $2,397.60, as attorney's fees.

2. Dr. S. R. Brown shall be Mr. Reed's treating physician for his work-related bilateral carpal tunnel syndrome and his right cubital tunnel syndrome. Nissan shall pay for the reasonable and necessary medical treatment for these injuries.

4. Nissan shall pay court costs of $150 to the Court Clerk within five business days of this order becoming final. Nissan shall also reimburse Mr. Reed for reasonable litigation expenses, including but not limited to Dr. Brown's witness fee and court reporter fees.

5. Nissan shall prepare and submit a Statistical Data Form within ten business days of the date this order becomes final.

6. Absent an appeal, this order shall become final thirty days after issuance.

**ENTERED JANUARY 29, 2019.**

Robert V. Durham, Judge
Court of Workers' Compensation Claims

7

## APPENDIX

Exhibits:
1. Dr. Brown's deposition
2. Dr. Hazlewood's deposition
3. Letter from Dr. Hazlewood to Dr. Brown
4. Notice of Mediated Agreement-January 13, 2017
5. Notice of Mediated Agreement-April 17, 2017
6. Choice of Physician Form
7. Letter from Mr. Reed's counsel to Mediator Tonya Murphy
8. Notice of Mediated Agreement-August 16, 2017
9. Employee/Manager Medical Statement
10. Referral Intake Form for Dr. Hazlewood
11. Petition for Benefit Determination with attachments
12. Certified records from Dr. Brown
13. Medical records made exhibits to Dr. Hazlewood's deposition

Technical Record:
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Scheduling Order
4. Mr. Reed's Pre-Compensation Hearing Statement
5. Nissan's Compensation Hearing Brief
6. Joint Pre-Compensation Hearing Statement
7. Post-Mediation Dispute Certification Notice

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Compensation Hearing Order Granting Benefits was sent to the following recipients by the following methods of service on January 29, 2019.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|------|------|------|------|
| R. Steven Waldron | | | X | arlenesmith@wfptnlaw.com |
| Thomas Tucker | | | X | ttucker@veazeytucker.com |

Penny Shrum, Clerk of Court
Court of Workers' Compensation Claims
WC.CourtClerk@tn.gov

8



## Compensation Hearing Order Right to Appeal:

If you disagree with this Compensation Hearing Order, you may appeal to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Compensation Hearing Notice of Appeal," and file the form with the Clerk of the Court of Workers' Compensation Claims *within thirty calendar days* of the date the compensation hearing order was filed. When filing the Notice of Appeal, you must serve a copy upon the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing of the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You bear the responsibility of ensuring a complete record on appeal. You may request from the court clerk the audio recording of the hearing for a $25.00 fee. A licensed court reporter must prepare a transcript and file it with the court clerk *within fifteen calendar days* of the filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within fifteen calendar days* of the filing of the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the hearing. The Workers' Compensation Judge must approve the statement of the evidence before the record is submitted to the Appeals Board. If the Appeals Board is called upon to review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. After the Workers' Compensation Judge approves the record and the court clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties. The appealing party has *fifteen calendar days* after the date of that notice to submit a brief to the Appeals Board. *See the Practices and Procedures of the Workers' Compensation Appeals Board.*

**To appeal your case directly to the Tennessee Supreme Court, the Compensation Hearing Order must be final and you must comply with the Tennessee Rules of Appellate Procedure. If neither party timely files an appeal with the Appeals Board, the trial court's Order will become final by operation of law thirty calendar days after entry.** *See* **Tenn. Code Ann. § 50-6-239(c)(7).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# COMPENSATION HEARING NOTICE OF APPEAL
Tennessee Division of Workers' Compensation
www.tn.gov/labor-wfd/wcomp.shtml
wc.courtclerk@tn.gov
1-800-332-2667

**Docket #:** _____

**State File #/YR:** _____

_____

**Employee**

v.

_____

**Employer**

**Notice**

Notice is given that _____

[List name(s) of all appealing party(ies) on separate sheet if necessary]

appeals the order(s) of the Court of Workers' Compensation Claims at _____

_____to the Workers' Compensation Appeals Board.

[List the date(s) the order(s) was filed in the court clerk's office]

**Judge**_____

**Statement of the Issues**

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

**List of Parties**

**Appellant (Requesting Party):**_____ At Hearing: ☐Employer ☐Employee

Address:_____

Party's Phone:_____ Email:_____

Attorney's Name:_____ BPR#: _____

Attorney's Address:_____ Phone: _____

Attorney's City, State & Zip code:_____

Attorney's Email:_____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____   SF#: _____   DOI: _____

## Appellee(s)

**Appellee (Opposing Party):**_____At Hearing:☐Employer☐Employee

Appellee's Address: _____

Appellee's Phone: _____Email:_____

Attorney's Name: _____ BPR#: _____

Attorney's Address: _____ Phone: _____

Attorney's City, State & Zip code: _____

Attorney's Email: _____

*** Attach an additional sheet for each additional Appellee ***

## CERTIFICATE OF SERVICE

I, _____ , certify that I have forwarded a true and exact copy of this Compensation Hearing Notice of Appeal by First Class, United States Mail, postage prepaid, to all parties and/or their attorneys in this case in accordance with Rule 0800-02-22.01(2) of the Tennessee Rules of Board of Workers' Compensation Appeals on this the_____day of_____, 20___.


[Signature of appellant or attorney for appellant]        _____

Attention: This form should only be used when filing an appeal to the Workers' Compensation Appeals Board. If you wish to appeal a case to the Tennessee Supreme Court, please utilize the form provided by the Court which can be found on their website at the following address:
http://www.tncourts.gov/sites/default/files/docs/notice_of_appeal_-_civil_or_criminal.pdf



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

### AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name:_____    2. Address: _____

3. Telephone Number: _____    4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

6. I am employed by: _____

My employer's address is: _____

My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ per month | beginning | _____ |
| SSI | $ _____ per month | beginning | _____ |
| Retirement | $ _____ per month | beginning | _____ |
| Disability | $ _____ per month | beginning | _____ |
| Unemployment | $ _____ per month | beginning | _____ |
| Worker's Comp. | $ _____ per month | beginning | _____ |
| Other | $ _____ per month | beginning | _____ |

LB-1108 (REV 11/15)                                                                                    RDA 11082

9. My expenses are:

Rent/House Payment $ _____ per month    Medical/Dental  $ _____ per month

    Groceries       $ _____ per month    Telephone      $ _____ per month

    Electricity      $ _____ per month    School Supplies $ _____ per month

    Water         $ _____ per month    Clothing        $ _____ per month

    Gas           $ _____ per month    Child Care     $ _____ per month

    Transportation  $ _____ per month    Child Support  $ _____ per month

    Car           $_____ per month

    Other         $ _____ per month (describe: _____ )

10. Assets:

    Automobile          $ _____    (FMV) _____

    Checking/Savings Acct. $ _____

    House                $ _____    (FMV) _____

    Other               $ _____    Describe:_____

11. My debts are:

Amount Owed             To Whom

_____        _____

_____        _____

_____        _____

_____        _____

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____
APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.

_____
NOTARY PUBLIC

My Commission Expires:_____

LB-1108 (REV 11/15)                                                                 RDA 11082